401 So.2d 1263 (1981)
Joseph Jerry BATISTE
v.
POINTE COUPEE CONSTRUCTORS, INC., et al.
No. 14274.
Court of Appeal of Louisiana, First Circuit.
June 29, 1981.
Rehearing Denied August 25, 1981.
*1264 Richard T. Redd, Joseph A. Gladney, Baton Rouge, for plaintiff-appellant, Joseph Jerry Batiste.
Charles W. Franklin, Baton Rouge, for defendant-appellees, Pointe Coupee Constructors, Inc. and Bituminous Casualty Corp.
Before COVINGTON, CHIASSON and LEAR, JJ.
COVINGTON, Judge.
This is a workmen's compensation case filed by the employee, Joseph Jerry Batiste, against his employer, Pointe Coupee Constructors, Inc., and its workmen's compensation insurer, Bituminous Casualty Corporation, claiming total and permanent disability as a result of a back injury allegedly sustained in a job-related accident, and penalties and attorney's fees due to failure to timely pay compensation benefits.
This case was consolidated with the plaintiff's tort suit against Rodney Robillard, John L. Morrison, Jr., John L. Morrison and Vaneta Morrison, who are allegedly executive officers of Pointe Coupee Constructors, Inc. We are rendering a separate opinion in that companion case. See 401 So.2d 1267 (La.App. 1 Cir. 1981).
In the workmen's compensation suit the trial court found that the plaintiff was entitled to compensation benefits of $85.00 per week from the date of the injury, February 19, 1976 through July 18, 1977, and certain medical expenses (subject to credit for payments made), and denied penalties and attorney's fees. From this award, the plaintiff has appealed, claiming that he is totally and permanently disabled and entitled to penalties and fees.
At the time of the accident, the plaintiff was employed by Pointe Coupee Constructors, Inc. as a working carpenter foreman. His employer was a relatively small company, engaged as a contractor in construction work. Batiste had only recently become employed by the contractor, although he had worked more than 20 years as a carpenter, and had especially engaged in the activity of building and erecting manhole or construction forms, the type of work he was doing at the time of his accident. Rodney Robillard was the craft foreman and immediate supervisor of Batiste, and John L. Morrison, Jr. was a director of the construction company and general superintendent on the Ethyl construction job. John and Vaneta Morrison did not actively run the company, or participate in the particular construction job.
On the date of the accident Batiste was working on the job of constructing, transporting and erecting construction forms for catch basins, a job that he and his co-employees had worked on for some time. They had already built and installed 23 manhole forms for catch basins and were working on the last such form when Batiste sustained the injury of which he complains. The work job of plaintiff and his co-employees consisted of building these forms in a construction building some distance from the actual job site, loading them on a pickup truck for transportation to the site, and erecting the forms in the catch basin site. It was while Batiste and a co-employee were carrying the last form that plaintiff suffered his back injury, when the co-employee stumbled and dropped his side of the form, causing a wrenching injury to plaintiff's back. The weight and size of the manhole forms were not definitely established by the record, but they were heavy *1265 and awkward to handle, about 200-300 pounds in weight. The accident happened about 10:00-11:00 o'clock in the morning, but Batiste continued to work for the remainder of the day and for five weeks thereafter. He reported the injury to his immediate supervisor that day after work.
Dr. Stephen M. Wilson, an orthopedic surgeon who was Batiste's treating physician, saw Batiste for the first time on February 24. Plaintiff stated to the doctor that while working at Ethyl Corporation he picked up some wooden forms and strained muscles in his lower back. The patient complained of some pain on forward flexion. After examination, x-rays and the usual medical tests, Dr. Wilson felt that Batiste had sustained an acute muscle strain to the lower back; but, other than some muscle spasm, the doctor was unable to note any objective clinical findings of injury. Plaintiff was advised to avoid heavy lifting for a time, but no other restrictions were placed on his activities. Dr. Wilson saw the plaintiff again on March 15, 1976, and observed that the muscle spasm had gone away and that he was much improved. At that time, the doctor told the plaintiff that he could gradually return to his normal duties and activities. Parenthetically, Dr. Wilson also saw Batiste on July 18, 1977, and his examination was negative of any objective findings.
The trial judge gave great weight to the testimony of Dr. Wilson, as follows:
"On the comp suit, the Court findsThe Court's findings will probably be set forth in the history of the visits to Dr. Wilson. February 24th, 1976, Dr. Wilson examined this man. The accident happened on February 19th, 1976. He found acute muscle strain to the lower back. On 3-15-76, he was much improved. He said he could gradually return to his normal activities. Dr. Wilson saw him on July 18th, 1977. The Court felt that the examination was negative as to any objective findings. Neurologically everything was normal. He was advised to return to his normal activities. The Court feels that in the evidence in this case, the preponderance of the evidence shows that the workmen's compensation should be awarded in the sum of $85.00 per week from February 19th, 1976 until Dr. Wilson's report on January 18th, 1977 [examination of July 18, 1977], subject to a credit for the time which he worked after the accident."
There is nothing in the record to indicate that Batiste did not return to his full duties on March 15, 1976, or that he was unable to work and perform his duties after his release by the doctor. Rather, the payroll records show that Batiste worked and was paid on a full-time basis during the immediate period following the accident; the testimony of Morrison and Robillard reveals that Batiste continued to perform the duties of carpenter foreman until such time as the work of the carpenters was completed and all of the carpenters left the job.
Batiste saw no physicians following his March 15, 1976 visit to Dr. Wilson until he was referred by his attorney to Dr. Gernon Brown, an orthopedic surgeon, on February 10, 1977. Dr. Brown's examination produced minimal mechanical findings and no orthopedic deficit. Dr. Brown was of the opinion that the plaintiff "was not disabled and could work."
He was then sent by his attorney to Dr. Byron Unkauf, an orthopedist, who first saw Batiste on February 14, 1977 (about one year after the accident), at which time the doctor felt the patient "had sustained a mild lower lumbar disc lesion." Next, the patient was seen on April 1, 1977, when the doctor observed some muscular tightness and pain. Dr. Unkauf indicated that further investigative procedures would be necessary before he could tell whether or not surgery was needed.
Following that, he saw no doctors until he was referred back to Dr. Wilson by the insurer on July 18, 1977 for a reevaluation. Dr. Wilson's examination again revealed normal findings and no disability. Batiste was advised to resume his normal activities.
Then, a period of more than two years elapsed without any treatment or consultation by a doctor until Batiste was referred by his attorney to Dr. Kenneth E. Vogel, a neurosurgeon.
*1266 He saw Mr. Batiste on August 2, 1979, and made neurological examinations. After seeing Dr. Vogel on August 2, 1979, plaintiff submitted to an EMG (a diagnostic test for nerve root interference), which was normal. He then returned to that physician on September 9, 1979. Dr. Vogel concluded that Batiste had a herniated disc and was unable to work as a carpenter and was "disabled, at this time, on a temporary basis" from doing construction work, but found no objective signs of any cervical problems. He recommended a myelogram, but Batiste declined to have one performed.
Batiste was referred back to Dr. Gernon Brown in October of 1979, who again found no objective evidence of back injury, but recommended further medical investigation.
On February 5, 1980, the plaintiff was seen by Dr. Richard Levy, a neurosurgeon, at the insurer's request. Dr. Levy found a completely normal neurological examination, with no signs of nerve root injury, and no indication for further diagnostic tests. Dr. Levy found nothing to suggest a ruptured disc.
On May 15, 1980, Dr. George C. Battalora, Jr., an orthopedic surgeon, saw the plaintiff. He found no objective findings from an orthopedic standpoint of any abnormalities or serious back problems. Dr. Battalora noted:
"A. My written opinion was, my initial impression was there was a large amount of exaggeration present when I evaluated the patient. Although he voluntarily restricted all back motion a good range of motion could be elicited while other maneuvers were being performed during the examination. I didn't feel there was any true and constant spasm in the back musculature, and I did not feel there was any abnormal neurological signs. He is a difficult patient to evaluate, and the symptoms have been so prolonged, I felt it would be justifiable in admitting the patient to the hospital for further diagnostic studies basically a myelogram."
Following the examination by Dr. Battalora, Batiste returned to Dr. Vogel on May 20 and June 5, 1980.
This evidence is sufficient to maintain the trial court's determination that the injury was not such as to render the claimant totally and permanently disabled, and that the plaintiff had failed to prove disability beyond July 19, 1977. Having found no manifest error, we affirm the determination by the trial court that plaintiff is not totally and permanently disabled. See Torregano v. Home Insurance Company, 356 So.2d 457 (La.App. 1 Cir. 1977).
The trial court may accept or reject an opinion expressed by any medical expert, depending on what impression the qualifications, credibility and testimony of the expert makes on the court. In evaluating the testimony of medical experts, considerable weight must be given to the opportunities each physician had for observation and examination of the patient and to the expert's familiarity with the patient and his history. In general, the testimony of a treating physician who has had the benefit of repeated examination, actual treatment of the patient, and sustained observation of the patient under his direct care, is entitled to greater weight and probative value than the testimony of a physician who has not undertaken the treatment of the patient but has merely examined him preparatory to giving expert testimony regarding his condition. In deciding whether an employee has proven his claimed disability, the totality of the evidence, medical and lay, must be considered. Tantillo v. Liberty Mutual Insurance Company, 315 So.2d 743 (La.1975).
It is the trial judge's function to determine the weight which is to be accorded the medical and the lay testimony. In carrying out this function the court below apparently gave greater weight to the medical evidence than it did to lay testimony, and greater weight to the treating physician than to the examining physicians.
It is well established that on appellate review, the trial court's factual findings *1267 as to disability are entitled to great weight. They are not to be disturbed in the absence of manifest error. Cadiere v. West Gibson Products Company, Inc., 364 So.2d 998 (La.1978); Laborde v. Roy O. Martin Lumber Company, Inc., 316 So.2d 440 (La. App. 3 Cir. 1975), writ denied, 320 So.2d 207 (La.1975).
We conclude that a reasonable evaluation of the evidence supports the trial court's finding that Mr. Batiste was no longer disabled after July 18, 1977. Therefore, this finding will not be disturbed.
Our careful examination of the entire record reveals that the plaintiff has failed to carry his burden of proving that his injury has caused total and permanent disability to him, or any disability beyond the time allowed by the trial judge. Hamilton v. Georgia Pacific Corp., 344 So.2d 400 (La. App. 1 Cir. 1977).
Furthermore, the trial judge's denial of penalties and attorney's fees can not be disturbed. LSA-R.S. 22:658 provides for the imposition of penalty and attorney's fees only when the failure to pay is "arbitrary, capricious, or without probable cause." This statute, being penal in nature, must be strictly construed; the burden is on the claimant to prove lack of probable cause, arbitrariness or capriciousness. Gauthier v. Employers National Insurance Company, 316 So.2d 769 (La.App. 1 Cir. 1975), writ refused, 320 So.2d 911 (La.1975). We find no manifest error in the trial judge's determination that the evidence does not indicate that an award of penalties and attorney's fees should have been made.
For the foregoing reasons, the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.